United States v. Jesus Verde-Montaner-Cabal United States v. Vega-Arizmendi United States v. De Silva Mr. Allen, I'm not sure I understood what you said about, at the beginning of your comments about blanket adoption. You said, if you weren't able to blanketly adopt the other arguments, you had some additional relief. What was that? Oh, I was saying that since we were all ordered to submit our briefs at the same time, we obviously couldn't do specifics with regard to joining in the arguments of our co-appellants specifically. That's why we did the blanket adoption. And I'm saying that since the court consolidated the matters and required us to submit our briefs simultaneously, then time should have been allotted or afforded to the appellants to then determine what specifics with regards to the other arguments that the co-appellants made that we just adopted. Was there any application made for extra time? No, no application was made for extra time. What else would you like to argue that you haven't been able to argue? What else is there that you want to argue before us? With regards to my appeal? Yes. You're not talking about the other appellants' arguments? I'm talking about your arguments. Okay. I mean, you've written the other things in the brief, which is before us. Correct. And that's all before us, and we will consider it. Correct. Okay. So what you're saying is that anything that I didn't get to argue because their briefs came in at the same time that mine came in, I can argue it now. Is that what you're saying? I'm not in charge of the panel, but do you feel that there's something more you would like to say in a written form if there was no blanket adoption? Yes. Okay. All right. We'll consider what you said. Okay. Thank you. Thank you. Thank you. Thank you. Thank you. We'll hear now from Ty Walker for two minutes. Okay. Good morning, Your Honor. Good morning. May you please support my name is T. Walker, and I will be arguing on behalf of defendant Sorry, I mispronounced your name. That's okay. The way it's spelled suggests that it would be pronounced Ty. Now, I would like to reserve two and a half minutes of rebuttal. Okay. That would be great. Thank you. Your Honor, unless there are any specific questions, I'll just jump into my argument. The first argument that I made was with regards to a variance in count one as it relates to the conspiracy charge. The substance of that argument, Your Honor, is that there was evidence, a wealth of evidence, put forth through a trial that made clear that defendants Todd and defendants Quinonez-Davila had no agreement to work together. In fact, not only did they have no agreement to work together, they made clear, and it was made clear through cross-examination of the main informant, Sean Baum, and also cross-examination of A.J. Gohmon, that they refused to work together. That they made statements to the informant that they refused to work together. That is one of those things that results in a conspiracy. I'm sorry? Your argument, I think your argument is that there are, if anything, there are two separate conspiracies. Correct. Right? So, to the extent that the government disagrees, right, based on the factual pressure that it argues, that would mean that your client would have to have withdrawn from what you described as a conspiracy. They were wondering if he's, you know, not part of this, he might be something else, but not part of this. As I think about the factual correctness, if I'm wrong, while he addresses or expresses some activity of refusal, right, he continues to act in a way that does not show that. Like, for instance, if I said, I don't like you, I don't want to work with you, and, you know, I separate myself and don't do anything, you know, I don't view it, your law practice, whatever, as an example, then that would be a withdrawal, which makes the argument stronger. That's not what happened here, if I understand it. You'll correct me if I'm wrong. Well, I would argue that there was a withdrawal. There was a withdrawal from the conspiracy to the extent that the conspiracy involved Defendant Hodge. And not only did Kenyatta Sabala make it clear that he did not want to work with Defendant Hodge, if I were to use your analogy, he said, not only am I not going to work with your law practice, I'm going to steal your client. So there was testimony in the record from Schoenbaum that Kenyatta Sabala even suggested, and I don't recall actually specifically who was Hodge or Kenyatta Sabala, one was even plotting to steal from the other. So Kenyatta Sabala, when he made it clear that he no longer wanted to work with Hodge because, admittedly, they had worked together in the very beginning of the conspiracy in at least one or two of the earlier alleged overt acts, once there was a fallout between the two, it was made clear to the informants that they refused to work together. And the reason that that fact is important is because the only connection between those two defendants turned out to be the informants who they could not have conspired with because they were informants. And when you look at my statement of facts and when you look at the evidence that came forth through the testimony, it was the informants that continued to try and connect Defendant Hodge with Defendant Kenyatta Sabala by trying to use the same people, by trying to introduce them to the same shipments of cocaine. But Defendant Kenyatta Sabala made it clear that he would have no dealings with Hodge, so there could not have possibly been an agreement between the both of them. But there was an involvement of the two of them at the beginning of the alleged, no longer alleged, the conspiracy, right? There was dealings between them with regards to a specific act. To the extent that the conspiracy or the act continued with Defendant Hodge, then Defendant Kenyatta Sabala arguably would have withdrawn from the act. Right. But we know that if a person is told on conspiracy and the person engages in activities until month one, and the conspiracy continues until month twelve, you still are guilty of conspiracy charge from month one to month twelve, even though you only acted, engaged in an overt act in month one. Well, I would argue that there is not a conspiracy between those two actors in the first act, or I would also argue that then Kenyatta Sabala would have withdrawn from the conspiracy because the conspiracy continued to involve Defendant Hodge. There were statements made to Schoenbaum that Schoenbaum testified to, particularly on cross-examination, that made clear that Kenyatta Sabala was doing his own thing. Separate and apart from anything that was going on with Hodge. The only thing that Hodge and Kenyatta Sabala did was continue to communicate and work with Schoenbaum. The only connection between the two were efforts from Schoenbaum under the direction of the agent to obtain evidence and to encourage these two to work together. I even included in my statement of facts, excerpts from the discovery with regards to the second informant that the government did not call their witnesses. NISBET, where NISBET is encouraging my clients who work with Schoenbaum, encouraging my clients who somehow may have some connection to Hodge, but to the extent that there was even a conspiracy that lasted for twelve overt acts, that was a conspiracy that was really engineered by the government who was the informant. And that's the crux of my first argument. I think my time may have run out. I don't know. I had a question, though. I'm a little bit confused by your acceptance of responsibility reduction. You spent a lot of thinking and grief talking about the government-based non-cooperation deal and all that, but is there anything in the record showing that your client actually accepted responsibility? I understand that, assuming all that is true about your relationship with the government, at any time, did your client actually accept responsibility? The evidence of acceptance of responsibility would be the testimony of the agent who questioned him. And it would be specifically the agent who testified as to the information he provided, who testified to the screenshot that he shared with them that was in his phone. So, if Your Honor is asking as far as— It's cooperation, isn't it? It is cooperation. Unfortunately, because of the context of the circumstances, and if I may just jump into that very briefly, the arrangement that my client had with the government at the time that he was arrested and he engaged in a proper session and counsel provided for him to engage in those proper sessions was for him to cooperate. And there were two reasons that he would be cooperating, according to this agreement or discussions he had with the government. One, that when he was extradited to St. Croix, that he would be released so he could continue cooperating. I understand all that. You speak to that very clearly. My question is just how did he accept responsibility as separate and apart from cooperating? Well, he accepted responsibility when he was cooperating, when he was engaged in a proper session. He could not, at this point, because the government had reneged on its deal, there was no platform for him to accept responsibility in the typical way, to say, well, I plead guilty because they had reneged. So he was not receiving the benefit of the information that he had provided. And not only did he not receive the benefit of the information he provided, that information was then used against him to convict him in trial. So the government benefited twice, actually, from this. The only possible resolution or the only possible remedy to the government reneging on its agreement would be the reduction in his sentence because he did provide the information, you used the information, and when you obtained a guilty verdict against Kenyatta's nephew, you obtained a guilty verdict against all the other defendants. Was there a letter or either transaction released? He just proffered without having signed anything or else. It makes it so that the government took the information and there was no understanding as to what was permissible with regards to the government's use of it? There was an understanding that I spelled out through the colloquy that was given at the detention hearing when his counsel at the time was questioned. And that understanding, as testified to by his counsel, Ms. Reyes, was that when you get to court, you're released so you can cooperate and you also receive the benefit of a reduced sentence. So you would receive a benefit at sentencing for providing this information and cooperating. And we also have to remember that when he provided the information, he also cooperated at the same time because he started texting suppliers. And when the suppliers would respond, he would share that information with the agent. So not only did he provide information, he cooperated and he received absolutely no benefit from that and was convicted as a result. And the reason I say he was convicted as a result is because the first trial resulted in a mistrial and the government didn't even disclose the screenshots that it had from his phone. One of the other major issues with this case was the government's discovery disclosures. That was not a part of the first trial at all, which ended in a mistrial. His statements were not used against him until the second trial. And the evidence that they had in the screenshots from his phone were not provided until the ease of the second trial or actually during the second trial. I'll have to check my notes. So the government definitely benefited from his information and his cooperation, turned around and used it against him so that he received absolutely no benefit. The only benefit he could have received would have been the recalculation of his sentence. Thank you, Tasha. We'll hear from you on that. Next we'll hear from Gina Espada-Picasso for Appellant Gutierrez-Calderon. Good morning. Good morning. My name is Tasha on behalf of Mr. Gutierrez-Calderon. I would like to reserve one minute for remodeling the meeting. That would be great. We will start with the extension, the overflow extension of the courtroom. We are convinced that in this case, the Sixth Amendment right to a public trial, which extends to jury selection, was violated with this alternative that the court chose. It is clear law, and I can cite press release, versus Georgia, that trial courts are obligated to secure the attendance of relatives, loved ones, and even the press during every phase of a criminal trial. Can that be a basis for making a conviction? Yes, Your Honor. It should be a basis. And do you have a case on that? Well, I can cite, I don't have the exact citation, but Candelario v. United States from the First Circuit. It was a death penalty case in which the court closed the courtroom for, and in that case, there was actually, because court, case law states that there may be circumstances in which the closure or limiting access of the public may be warranted and requested, but this was not the case. In the case of Price v. Georgia, there was an ambiguous fear that because it was a small courtroom, the relatives could be near the jury panel and they could overhear anything that was said. That was the case. In this case, it was simply a reason of comfort, for lack of a better word. It's a small courtroom, so they wanted to have all the panel together, and they opted for the most onerous alternative, which is to exclude the relatives and place them in the overflow room, so-called, so that they could see it from the closed-circuit TV. Now, there was an evidentiary hearing, mainly promoted by Mr. Gutierrez-Caderon's pro se motion and then supported by a substantive motion filed by his trial counsel. In that hearing, even the witnesses, Arroyo and Messier, who were court officers, stated that at least Arroyo said that on one occasion she passed by the overflow and the closed-circuit TV wasn't working. So that completely rebuffs the fact that it was a public trial in the sense that the relatives were not allowed to come into the courtroom and the facilities that were allegedly prepared were not functional and no previous notification was provided to counsel that this alternative was the one chosen by the court. When case law, such as, I'm sorry to be repeating the same thing, Presley v. Georgia states that other alternatives can be explored, such as, for example, dividing the panel, or perhaps they could have put half of the panel in the overflow room and allowed for at least one bench for the relatives. So this is an egregious violation of Mr. Burgueda-Caderon's Sixth Amendment right, Your Honor. If I were to ask you a kind of threshold question, I believe that you argued that the motion regarding this matter, it was untitled, but that should be excused because your client told prior counsel about the whole issue. That's correct. Do you know where in the record that is? Is there any evidence of that? If so, where is that in the record? Well, Your Honor, that is one of the problematic issues, was that prior counsel did not put Mr. Caderon, who did his defense, to testify to that effect. So in that sense, the record is void of that fact. But nevertheless, it was rigged all the time. And still, we believe that that would not really cure the violation of the Sixth Amendment right. We made some further arguments regarding, Your Honor, enhancements, specifically that Mr. Burgueda-Caderon deserves a three-point increase because he was a supervisor, manager, or leader. The record, truly, Your Honor, where he was present in Marion's bar socializing and that he sent some money that was never really corroborated, that his intent was to send it to further the drug trafficking endeavor. So in that sense, Your Honor, we believe that even taken in the most favorable light for the government, that those enhancements would not and should not proceed. Are there any questions? I think not. Thank you, counsel. We shall move on. Thank you. All right. Next would be Mr. Lynch for Appellant Vega, or his name. Good morning, everybody. I forgot something. My memory is good, but I was diagnosed with COVID now. And it's coming better than it was two months ago, three months ago. And if I have to look or anything like that, bear with me because, of course, I'm working in that. OK? Now, I know Your Honor read the brief. I'd like to, there's a certain part that I observed that I put Mr. Amar twice. And I sincerely apologize to me. There was a little too much respect. My concern, as a former police officer, I know Sean Baum. I know the Sean Baum family. And the father was a well-respected person in the police department when I was there. The children did not turn out that way. Mr. Sean Baum, who was a police officer, was terminated from the police department. He was arrested. And after he was arrested, he then started working as an informant with the federal government. I submit to you that he was facing so much time that he came and sat right here, and he lied, and he made all types of misrepresentation. And in reference to my client, what is most important is that if you look at the entire record, it does not show that my client was identified until coming to the end of the trial when the government was wrapping up. Well, I mean, compare this, counsel. I mean, the jury had an opportunity to consider the testimony, the photographs, the names of the tattoos identified, and they still rejected it. No, you see what happened. You have to look at how the tattoo, for the first time with a tattoo coming to the end of the trial,  say he's identifying a tattoo. Now, our position is that the tattoo that he identified, first thing, he did not know my client that way. But the father came and also testified that his son's tattoo was not at the location that Mr. Schoenbaum said. OK? Now, what is most sad about this case is that a year later, I find out that one of the jurors' son, who are good friends and in cahoots with some of the illegal things that Mr. Schoenbaum did, is, of course, of no consequence in this case. It wasn't proven. It didn't happen. But what I am saying, at all point in time, Mr. Schoenbaum was not a credible witness. And he lied. And we tried to prove that he lied because he was getting such a benefit from the federal government. And that is the long and the short. And he testified to anything that they wanted to get out of here. OK? And that tattoo, the father, I found him from Puerto Rico. And the father, looking at the video, said that that is not a tattoo of his son. He said that he had a tattoo. But if you look at the entire transcript in all the cases, Mr. Schoenbaum and my client, Mr. Arizmendi, did not have any interaction. My client did not have any interaction with any of the other people. And my position. Are you saying that he was on any of the trips? I am saying that there were times that he was on the boat. But I am not saying that he ever went to South America with them. And there's no evidence in the record that shows that. There is no evidence that shows that he takes up any jobs. None. And I submit that I rely strongly, I think I reviewed my brief several times since starting last week up until last night and this morning to make sure there's nothing that I need to add. What concerns me most, and- Was your client on job number two or no? I didn't hear that. I said, was your client on job number two or no? On job with me? The second job, if you will. The second job. If he was with me? No. Was he on the boat for the second run? I cannot answer that. I don't think so. But as an officer of the port, I would not swear to that. Because as far as my client has indicated to me, he spoke Spanish, I speak English, and I lived with the Spanish. I did not understand that he ever went. There's no evidence of that in the record. And there were times that the testimony came out that they were together, but they were together on the island. And nothing wrong with that. What concerns me most is that one of the jewelers and some, and Mr. Chamba were very good friends. The next thing that concerns me most is that he got the help of Adeel, and I am not a criminal. I don't mean to be a criminal, but I think if I put myself in the shoes of a criminal and if I was in his place, I would have done exactly what he did, and I would have lied and do everything possible not to go to jail. And I think that that is what Mr. Chamba did, and he brought further testimony against my client. And the record will clearly show that he's not hiding my client from all the other stuff that I have heard. And the only thing that we are looking at is they're saying he is in a boat. The picture of the boat is in the harbor here, not even outside of the Washington section of the human zone. What about the testimony that your client was on the Scorpion during all the attempts to retrieve cocaine? What about that testimony? My client, he did not take the stand and deny it, but my client told me that it wasn't true. There was testimony to that fact, though, right? Yes, there was testimony to that fact from Chamba, and I am saying that you should never believe Chamba. You have to know Chamba. Chamba and family, they are police officers. They were terminated from the department because of illegal activities. But I was a police officer. I know. And I know that he knew how to work the system. Chamba knew that if he cooperated with the FBI and he'd tell him what he didn't need to hear, he would walk. And that's what he did. He walked. And that is my concern. That is my concern. We didn't believe him when he was a police officer in the Virgin Islands Police Department, and I do not believe when the police are arresting him. And I think that the FBI agent wanted someone like him to work with him, and he worked and he lied and did everything he had. As a matter of fact, who is being honest to show that he and his siblings have had problems over drug fights? Well, thank you, counsel. I think we understand your argument. And your time is up. Thank you very much. Thank you for speaking and addressing me all. Thank you. I look forward to the rest of the day in the Virgin Islands. Thank you. Thank you. Now we'll hear from the governor. Good morning, your honors. May it please the court. Adam Sleeper on behalf of the United States. I look forward to specific questions or issues that they want me to address. I'm going to lead with the issues that have been raised by my friends. I wonder about the last question. Why don't we start with the last question? That's the sufficiency of the evidence regarding Anne Boles, Vega, and Resmendy? Yes. Your honor, a consistent theme in these motions for judgment and acquittal is a lack of trust for Timothy Schoenbaum. The bottom line is that the jury heard his testimony, considered his testimony, credited his testimony. This is not the venue for relitigating the credibility issues that were raised at trial. Touching on the specific instances that Anne Boles, Vega, and Resmendy were involved in, I put together a chart who was involved at different times. What I have is Kim Anne Boles, Vega, and Resmendy was involved on the second and third trip in October 2014, the third trip of which was successful in retrieving 71 kilograms of cocaine. He was also participated in the first and second trip in December 2014, and I also see him participating in several trips on November 2015. So there was far more testimony in the record as to his involvement than just the picture. Correct, your honor. And not only is there testimony about him being on the vessels going out, there's testimony on him being on the vessels going out before and after there was a successful retrieval of cocaine, you know, belying any sort of allegation that he may not have known what they were intending to do when they were going out on the vessel. Turning to the tattoo issue and all of that, the jury was able to see the tattoos. Obviously those tattoos and what he showed on that day are not in the record at this time, but the jurors were able to consider that. They've seen the pictures, they saw the tattoos, and they're still convicted. There's certainly no basis in the record for the court to determine that that, you know, for whatever reason was so suspect that it would be warranted a judgment of acquittal. Shifting to the acceptance and responsibility question that is defendant Sergio Quinones-Dabla, as a preliminary matter I know that I don't believe it's been resolved as to whether or not there was any sort of cooperation agreement or if there was a cooperation agreement, what exactly its terms were. I didn't have counsel about sort of perhaps disconnect between acceptance and responsibility and cooperation. Is that something that you would agree with or would you comment on that? Yes, Your Honor, I think it's a different question and I think it's a different remedy. If the defendant says that he's giving statements based on he was somehow misled about the cooperation agreement or we did not act in accordance with the cooperation agreement, the remedy there is to seek some sort of suppression of those statements or something along those lines. That doesn't turn into some equitable acceptance of responsibility. Acceptance of responsibility, if defendant Quinones-Dabla wanted to accept responsibility, he very well could have. All he had to do was plead guilty to the charges. And frankly then, in sentencing, he could have brought up all of this other stuff as well and argued that there were factors that could be considered as something. None of this has to do with whether he accepted responsibility. The things we're looking to when he's accepting responsibility is if he's going to trial on this, if he's contesting his factual innocence or contesting his factual guilt, and that's very much what he did here. I don't think there's anything in this record that would show or come close to showing that the district court clearly erred in determining that he had not accepted responsibility. I think the argument was that he had been misled. I wonder, I asked a question about whether there was some sort of community letter given at the time proper. In the absence, I presume there's nothing.  In the absence of that, is there anything, including the government, confusing information that may have been related in that process? At the risk of making arguments for my co-counsel, I think maybe you could try to make some sort of argument about involuntariness based on false promises or things like that, maybe to ask for context. But again, none of this would go to acceptance of responsibility. It would go to should we be suppressing statements, which was not an issue that was presented or litigated, and it's entirely separate and apart from the acceptance of responsibility issue. Moving on to the variance issue that's also raised by the defendant, Quinones Davila, there is certainly sufficient evidence in this record for a reasonable jury to determine that this was one conspiracy rather than two. We have the evidence of, I think the real meat of this argument is that Hodge and Quinones Davila are separate. I don't know that the defendant has really split out who's in which conspiracy, but I think certainly the takeaway allegation is that there's at least one conspiracy with Hodge and one with Quinones Davila, and I'm not entirely sure where the other people are in this setup. But Hodge and Quinones Davila, there's clear evidence of them working together in August 2014, October 2014, November 2014. Then once you get to November 2015, there's Hodge meeting Schoenbaum with the other conspirators, and Schoenbaum and Quinones Davila speaking later that week, and Quinones Davila saying that he's surprised Schoenbaum. Now, I know that the defendant argues that Schoenbaum is not reliable, but again, we run into the same issues that we have with the argument raised by Annabelle Bay Harris-Mendy, and that's that the jury was able to make contrary credibility determinations regarding Schoenbaum's testimony. Is there anything to this at all? I don't think so, Your Honor. I think what this shows is that there was an ongoing conspiracy. There was certainly some friction between the two members of the conspiracy, Quinones Davila and Hodge, but I don't think there's anything in the record that would require a determination, or that would prevent a jury from determining that there was just one continuing conspiracy here. I'd also note that once we get to November 2015, both Quinones Davila and Hodge were ensuring that Schoenbaum was paid for gas. I believe in my brief I said 2014. I'll file a notice for erratives, because that's an important date to get right. And also that there Hodge introduced Schoenbaum to Danny Boyer, who was first mentioned in that 2015 issue, and then after the November 14, 2015 arrest, Quinones Davila asked where Danny was. So what this all shows is that these people are still working together. This is one conspiracy. Certainly the jury was entitled to make that finding, and there's no basis for granting a judgment of the will or capitalizing for that reason. Turning to the Peter Comey issue, Peter Comey had personal knowledge because he was there. He was the one translating the statements. His ability to understand and translate those statements also were not an issue. The district court said, I believe it was in the footnote, or it might have been a footnote in our brief, but at least the district court addressed it and said, if there's some sort of due process issue here about whether Peter Comey can translate Spanish, he clearly knows Spanish. He translates regularly. There's no basis for an objection there. So really the sole question is, does Peter Comey have no knowledge of the conversation that he himself translated, and was he solely testifying from these notes? Your adversary point out is a hearsay problem. Well, there would be if he was just solely testifying from their notes, but that's not what the record plays out. The record plays out that he said he recalled the conversation, and certainly nothing stops the governor or anyone else from refreshing his recollection with notes from someone else. It supposes that the notes were played in program and testified from the notes. Is there? I didn't see anything that would indicate that to me in the record, Your Honor. And so under these circumstances, we think that United States being Mesopotamian is clearly inapplicable. We're not dealing with the question of whether or not Peter Comey is testifying as an agent of the defendant or not. Rather, the hearsay exception of the issue is admission as a part of the opponent, and Peter Comey being present there at the time and hearing and understanding the original statement from the defendant was perfectly qualified to testify to that. Turning to the issue raised by Jose Hodge, and that is the question of jurors, of the jurors. What distinguishes this case from all of the cases that are being cited by defendant Hodge is that there's just no indication that any of these jurors spoke to each other about any of this. Well, I think your adversary, your friends across the aisle would say, well, we don't have that because the judge didn't give us a chance for hearing or doing anything. How do you respond to that? Well, just to clarify, Your Honor, that's why I'm saying there was not plain error to not hold a hearing because there was no indication that there was this type of conversation. So in the cases cited by the defendant where they're talking about, oh, the court really needed to be holding a hearing, that's because there's testimony that, for example, the juror was threatened or something was said to them, and then they told the other jurors about it. Here, there's just no comparable statement being made. Juror 5 said she told no one about it. Juror 12 said he told no one about it. I know the defendant speaks about defendant 12 during their – so defendant 12, there was a first conversation on one day, then a second conversation after he was sent out, and then he was dismissed on a second day. I know defendant in his brief references that juror number 12 was sent out from that first meeting without any instruction not to speak to the jurors. But one, it's not in the record where he went. It's possible he may have gone and spoken to the jurors. But two, on the second day when he was excused, he specifically told the judge that he had not spoken to anyone about this. So there's no indication in the record that either juror 5 or juror 12 communicated any of these issues to the other jurors. In the absence of that, it's certainly not plain error. Why was it appropriate for the district court to question juror number 12 ex parte on the second occasion? Your Honor, I would agree. I don't think that was the best way to go about it. But again, we're in plain error, and I don't think that we had – to the extent that that wasn't the best way to approach it, I don't think we have anything that would justify relief under plain error review. I'd also note that this issue is raised by defendant Hodge. Defendant Hodge, on the first day, took the position that juror 12 should have been excused. So the only thing that came of the second meeting was, in fact, juror 12 being excused. So it's difficult to see how there was any prejudice for juror 12 – I'm sorry, for defendant Hodge when he got the relief that he'd been actually seeking out of that hearing. Turning to the issues raised, the issues discussed by defendant Omeo Gutierrez Calderon. To speak a bit about the closed courtroom, this is not – because we are on plain error review, and the defendant agrees, this is just not – to the extent there is an error, and the case law in our circuit is to exactly how overflow rooms work and all of that, it's a bit unsettled, and there were some technical issues here. So I don't think the court needs to resolve those issues here. I think probably the better way to resolve it is through the argument the government raised in its brief, and that's that even if there was an error, this error would not have seriously affected the fairness, integrity, or public reputation of judicial proceedings. The question is, is there an untimely issue? There is, Your Honor. There is. And the district court found that it was untimely, and that determination has not been challenged on appeal. And so any argument that it was timely has been waived at this point. Just to touch on the merits, where the district court considered the issue of the apparently large number of jurors and provided an overflow room shows that they were considering an alternative to excluding the public entirely and were really trying to make it available to the public. Also, the judge was not informed that anyone believed that they were excluded. It was only five days of a two-month trial, and because there was a large veneer, 131 people, there were significant members of the public that did not end up in the jury serving it, and there was no suggestion of misconduct during Brodeur. And turning to the other side, the cost of a new trial, this would be redoing a two-month trial. I think at this point we're four and two-thirds years after the fact, after the second trial. And so just weighing against each other, under Williams, this is not the type of error, if it were an error, that would warrant printing any relief on the issue. If the court has any questions about any other issues, I'm happy to discuss them. Thank you. Your brief covered a great deal. I think we have nothing more for you. Thank you, Your Honor. Thank you. And we'll hear a rebuttal from the attorney's team when the account is considered. Your Honor, as the government said in its response to Congress, there's no understanding of the problem because the statement made by Chief Harlow was a party admission. That statement in itself sort of applies the language of conduct theory. Because Chief Harlow's statement, his party admission, was made in Spanish. The only way you can somehow attribute an English version of that statement is by applying some sort of conduct theory or by applying the Ninth Circuit ruling. And that's what the court didn't do in this case. The court simply stopped it, simply saying a Spanish statement is a party admission, but we don't have to get to that English translation. And that's the error. That's the hearsay problem that is inherent in this type of situation. And so I would have to contend, Your Honor, it's not, it isn't correct to simply say that there is no hearsay problem there. So with that, I'll let some further questions come up. Thank you, counsel. Can we finish at reserve time? Ms. Walker and Ms. Estrada, please. Okay. Ms. Walker, do you have any more questions? Yes, Your Honor. With regards to the acceptance of responsibility issue, and Your Honor's questions with regards to acceptance of responsibility versus cooperation, I believe counsel for the government argued that there was no necessary basis that would preclude the government from using those bases in the absence of some sort of written agreement or something to that effect. And I would argue that there would actually be a common law basis for the preclusion of that, because there was a breach of an agreement. The argument that that issue should have been resolved by way of a motion to suppress. The statements by Mr. Pinon and Zavala were produced on March 14th, 2018. The trial was April 2018. In addition to those statements they produced, there was other evidence that was still being produced. The statements that were produced in the form of screenshots and there was some CDs that contained audio were in Spanish. So those also have to be translated. And one of the things that I did prior to trial was request a motion. I filed a motion for continuance because of the untimely disclosures, which was denied in part and granted in part to the extent that I think the judge allowed for an additional two weeks. And what the record does not capture is the tone of the trial. The fact that there was just so much withheld evidence that was continuously being disclosed on the eve of trial and the morning before we would walk into the courtroom and we would find new evidence on our desk. Now, with regards to those statements that were used in the second trial and not in the first trial, one of the arguments that was made by the prosecutor at the time, Attorney Andrews, when I raised the issue regarding the agreement was, it doesn't matter, we're not using it anyway. On the eve of the second trial, that there's a dump of the phone, there's a dump of all the screenshots, the text, and the statements. Now, the argument that Mr. Quinones-Douglas did not accept responsibility does not, because he did not enter a guilty plea, logistically doesn't make sense. There was no plea offered that would have given him the benefit of the cooperation in the earlier sentence. It's not a unique situation, though. Defendants make proffers. Prosecutors reject them. You know, if you look at the state basis, counsel sometimes thinks that that information, or at least that offer, available to the sentencing court. You mentioned an agreement as well. What agreement are you referring to? The agreement that he was going to leave when he was transported to the court, so he could continue to cooperate and he would get a benefit for it at sentencing. He didn't get a benefit for it at sentencing, which is the basis of my argument. And I relied on the comment to the sentencing guidelines, which made clear that even in the absence of a plea agreement, if a defendant goes to trial, the fact that he goes to trial does not foreclose him from receiving the benefit of accepting responsibility. The comment made clear that a conviction doesn't necessarily mean that he does not get that benefit, because he could have went to trial for other reasons. When you review the transcript of the second trial, you will notice that there is no, it was not a claim by Mr. Quinones-Douglas that he was not engaged in drug trafficking. Mr. Quinones-Douglas' arguments were, I wasn't in a conspiracy with Hodge. Mr. Quinones-Douglas' arguments were, you know, I was not involved in these last overt acts, because I had withdrawn. I had told them that I was not working with Hodge. The only way he could preserve those arguments is if he went to trial, which is what he did. But at the end of the day, those statements that he made in the cooperation he provided after his arrest were used against him in the breach of an agreement. And the only relief that he could receive was that acceptance. Would it be fair to say that your client continued to contest his factual guilt at every stage of the proceeding? He continued to contest his factual guilt to the way that he was charged, to the extent that he was charged in a conspiracy with Hodge. But at the end of the day, there should be no benefit to the government to use statements when they breach the agreement with him. And then one of the other arguments that I wanted to address, I believe, dealt with the count one conspiracy charge, which I believe the argument was made that Quinones-Douglas inevitably continued to work with Hodge and worked with Hodge in one of the later overt acts, when Desmond had traveled to Des Moines, Schoenbaum had picked them up, he had brought them to the area of the grocery store. When you look at the record and you look at the testimony of Schoenbaum, those were two separate incidents. There was not an agreement for Hodge and Quinones-Douglas to work together in that later overt act. In fact, what was happening was that Hodge was trying to steal the shipment from Quinones-Douglas. So there was no agreement and there was no conspiracy. And then finally, I want to ask about the blanket incorporation. And I understand, Your Honors, thickness with regards to not being able to incorporate the arguments of other counsel, to the extent that, Your Honors, we're considering... You talked about blanket for our opinion and thoughts on the case. I understand. I understand that. But to the extent that we're still making a record on a kill today, if I were to identify specific arguments to incorporate, it would be that of defending Hodge with regards to the jury's issue, and it would also be that of defending the insurance counsel wrong with regards to the expulsion of the family members from the program. Thank you, counsel. Thank you. And we'll finally hear from Ms. Estrada-Castillo. Thank you. During my previous intervention, the court specifically asked whether there was any type of case law... Excuse me for one second. Do we set our time? Okay, that's okay. Okay, thank you. Sorry. I lost my way. The court... I'm sorry. The panel asked us whether we had any specific case in which a new trial was granted. And we said Candelario case. It's Candelario-Zampana, 8-34 Federal 3rd, 8, 2016. In this case, de facto closing happened at the courtroom because one of the witnesses feared for his life. This is a massacre death penalty case in Puerto Rico with a lot of press. The judge opted to make it like a false closing of the case and resumed the works of the court outside of the public to safeguard the witness' reluctance and fear. Now, we put forth, Your Honor, that in this case, it's pretty similar. A de facto closing happened, first of all, because the defendant's family members attempted to enter and they were excluded. They were consistently told that they could not be there. They were moved to a room where none of the officers could really safeguard the fact that the CCTV was functional and they were actually viewing. And we put forth, Your Honor, that does lacerate the trust and the integrity of the judicial system. Our judicial system is wonderful because it's transparent, it's public because judges, witnesses, and defendants and all the parties involved in a trial are subject to scrutiny from the public. But the moment at any phase that the public is excluded, then that should warrant a new trial, Your Honor. And there are more so than comedy considerations like expense and inconvenience and the length of the trial. We put forth that this type of violation is so egregious that only a new trial can be the only remedy for this type of Sixth Amendment violation, Your Honor. Your time is up, counsel, but if you have one other quick point, we could... No, that's great. Thank you. All right. Thank you, counsel. We appreciate it. We thank all counsel for their excellent, both written and floral argument today. And we'll take the case under advice. And that's the Courtroom General Court for today.